IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE RAMON JIMINEZ,<br><br>Defendant. | ORDER & MEMORANDUM DECISION<br><br><br><br>Case No. 2:04CR852 TC |

The Federal Grand Jury for the District of Utah has charged Jose Ramon Jiminez with the knowing and intentional possession of fifty grams or more of methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and aiding and abetting under 21 U.S.C. § 2. Mr. Jiminez has moved to suppress all evidence obtained as a result of his encounter with officers on September 23, 2004. Mr. Jiminez argues that the officers did not have sufficient justification to perform a pat-down search and that all evidence obtained as a result of that search was obtained in violation of the Fourth Amendment and should be suppressed. An evidentiary hearing was held on April 4, 2005.

For the reasons set forth below, Defendant's motion to suppress is DENIED.

**Findings of Fact**[1]

On September 23, 2004, Sueann Cotonuts reported that there was a man wearing a white sweatshirt who appeared to be intoxicated near the Darrell Shavanaux residence on UR-88 near Randlett, Utah, on the Uintah Ouray Indian Reservation. Ute Tribal Officer Brian Tabbe and Lieutenant Terry Olson of the Bureau of Indian Affairs ("BIA") responded to Ms. Cotonuts' call. Both officers testified at the evidentiary hearing on this motion to suppress.

Officer Tabbe and Lieutenant Olson were driving towards the Shavanaux residence near Randlett, Utah, when they saw Mr. Jiminez sitting on the side of the road. Lieutenant Olson testified that they saw: "a person sitting on the side of the road . . . , had his back toward us [.]" (Transcript of April 4, 2005 Evidentiary Hearing ("Tr.") at 8). Mr. Jiminez was wearing a white shirt under a denim shirt that he wore as a jacket.

When the officers drew near to Mr. Jiminez in their vehicle they noticed what appeared to be blood stains on the back of his shirt (the officers later confirmed that Mr. Jiminez's back was not injured). The officers got out of the car and began to ask Mr. Jiminez some questions. Officer Tabbe testified: "Lieutenant [Olson] was speaking with the individual, trying to get his name. You know, after asking him several times, we could understand some of the stuff that he was saying . . . . And we asked him just what he was doing there, if he was hurt." (Id. at 72). Both officers noted that there were communication problems that they attributed to Mr. Jiminez's difficulty speaking English and also to his apparent intoxication.

Mr. Jiminez told the officers that: "he'd been dropped off at the Randlett Merc, which is a little grocery store in Randlett, and they'd bought some items and had called his brother to come pick him up." (Id. at 17). He told the officers that he was sitting at the side of the road:

---

[1] Unless otherwise noted, all facts are taken from the April 4, 2005 evidentiary hearing.

"Because . . . after he called his brother to come get him, he started walking . . . and that his . . . right knee . . . had started to hurt so he sat down on the side of the road." (Id.). Mr. Jiminez also apparently told the officers that when his cell phone battery died he had discarded the phone somewhere along the road..

The officers both testified that Mr. Jiminez appeared intoxicated. Lieutenant Olson testified that Mr. Jiminez "was fidgety, moving around a lot, moving his hands" and had "shady facial features, red, bloodshot eyes." (Id. at 10-11). Officer Tabbe described Mr. Jiminez: "We thought he was intoxicated to some degree, under something . . . , it looked like he . . . didn't have any sleep for while. His eyes were really bloodshot and red. You know, just kind of – he seemed intoxicated, but I couldn't smell any odor of alcohol on him." (Id. at 70). Lieutenant Olson also testified that he could not detect the odor of alcohol. The absence of the smell of alcohol led the officers to conclude that Mr. Jiminez was intoxicated on another substance, likely methamphetamine.

> Lieutenant Olson testified:
>
> Within the boundaries of the reservation, it is a violation of Ute tribal law to be under the influence of drugs. And normally if we respond or when we respond to calls and somebody is under the influence, regardless of the amount, we arrest them and transport them to the B.I.A. detention center.

(Id. at 11). Both officers both testified that when they find an intoxicated person on the Uintah Ouray reservation who is not a member of the Ute tribe, they do not take him to the B.I.A. detention center, but call the authorities from the county in which the person is found. The officers also testified that even if a person is "under the influence of alcohol or drugs to a degree that they may not be booked" the officers normally call an ambulance to have the person "checked out." (Id. at 18-19).

After they had spoken with Mr. Jiminez, the officers called for an ambulance, but it "was

going to take anywhere from 20 minutes to 30 minutes" for the ambulance to arrive. (Id. at 72).

Officer Tabbe testified that they called the ambulance because:

> We still didn't know what was wrong with him. And . . . the language barrier, it was kind of hard at the time. We'd ask him questions. He'd nod his head, you know. And he didn't want to look at you. He was just kind of fidgety. He didn't want – he didn't act like he was hurt or anything, but we just wanted to make sure that . . . he wasn't.

(Id.. at 73).   While the officers were waiting for an ambulance to arrive, Officer Tabbe walked back along the road where Mr. Jiminez indicated that he had discarded his cell phone, but could not find the phone.

Lieutenant Olson testified that when Officer Tabbe returned from his cell phone search: "I was talking to [Mr. Jiminez] and had asked him if he had any guns, knives or drugs on him that I needed to know about." (Id. at 19).  Mr. Jiminez responded: "I don't know." (Id.) Lieutenant Olson then told Mr. Jiminez: "for his safety as well as ours I was going to pat him down." (Id. at 20).   Lieutenant Olson testified that he initiated the pat down: "Because of the response . . . that he didn't know if he had anything on him that I needed to know about – officer safety issue." (Id.).  Mr. Jiminez remained seated at the side of the road.

As Lieutenant Olson bent over to start the pat down he noticed a package of cigarettes in the chest pocket of Mr. Jiminez's denim shirt.  Lieutenant Olson testified: "I see a piece of plastic sticking out of the very top [of the cigarette package].  It's a flip-top pack, and it's opened – the top is actually crushed, and there was a piece of plastic sticking up out of it." (Id. at 24). Lieutenant Olson further testified that the type of clear plastic made him believe that the cigarette package contained narcotics.   Lieutenant Olson signaled to Officer Tabbe to look into Mr. Jiminez's pocket.  The officers then removed the package of cigarettes from Mr. Jiminez's pocket and looked inside the package.  Lieutenant Olson squeezed the sides of the cigarette

package "to open it up wider" and saw what he believed to be methamphetamine. (Id. at 28). Lieutenant Olson testified that he also discovered a "broken off pen" in Mr. Jiminez's pocket which he believed to be an instrument "commonly used to snort or inhale through the nose narcotics, methamphetamine, coke." (Id. at 33). The officers placed Mr. Jiminez in handcuffs and notified the Uintah County Sheriff's office that they "had a nonindian male" and had "found some narcotics on him." (Id. at 30). Officer Tabbe testified that once Mr. Jiminez was in handcuffs he and Lieutenant Olson were "detaining him for another agency." (Id. at 79).

Once Uintah County had been contacted, Lieutenant Olson testified that he "continued the pat-down." (Id. at 33). The officers continued with the pat down: "Because we'd located narcotics, and . . . not knowing whether he had any weapons on him . . . or drugs that I needed to know about." (Id. at 31). Lieutenant Olson explained that before the continuation of the pat down, Mr. Jiminez was in custody and that they were "going to detain him for Uintah County." (Id.). During the pat down, Lieutenant Olson testified that he: "pulled the bottom of [Mr. Jiminez's pant leg] open and shook it and more narcotics fell out . . . ." (Id. at 34). Lieutenant Olson also noticed: "In his left arm he had a bulge that hung down when he had his arms extended out in front of him." (Id.). Lieutenant Olson examined the bulge and discovered more methamphetamine.

### Conclusions of Law

An investigatory detention is a brief seizure by police based on reasonable suspicion of criminal activity. United States v. Johnson, 364 F.3d 1185, 1188 (10th Cir. 2004); see also Terry v. Ohio, 392 U.S. 1, 26 (1968). An officer may stop an individual whom they reasonably suspect is engaged in criminal activity, question him briefly, and perform a limited pat-down search for weapons. Terry, 392 U.S. at 27.

Under Terry, a court must first determine whether the detention was "justified at its inception" Terry, 392 U.S. at 20. The government "must be able to point to specific articulable facts which, taken together with rational inferences from those facts, warrant the intrusion." Id. at 21. "Those facts must tend to show that the detainee has committed or is about to commit a crime." Johnson, 364 F.3d at 1189 (citations omitted). If a court concludes that the stop was reasonable at its inception, the next question is whether the officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)). The reasonableness of an officer's "suspicions is 'judged by an objective standard taking the totality of the circumstances and information available to the officers into account.'" Id. (quoting United States v. Lang, 81 F.3d 955, 965 (10th Cir. 1996)); see also United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997); United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

The totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. The officer's conduct should be viewed with "'common sense' considering 'ordinary human experience.'" Villa-Chaparro, 115 F.3d at 801 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). This approach is "intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions. Villa-Chaparro, 115 F.3d at 801 (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995)); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

The initial question here is whether Lieutenant Olson and Officer Tabbe had a reasonable suspicion that Mr. Jiminez had committed, or was about to commit, a crime. In this case, the officers received a report of an intoxicated man located near the Shavanaux residence on U.R. 88. The officers arrived at the specified location and found a man sitting at the side of the road. The officers approached the man and noticed what appeared to be blood stains on the back of his shirt. The officer both testified that Mr. Jiminez was fidgety, had bloodshot eyes and was having trouble speaking, but that they could not smell alcohol on him. Officer Tabbe and Lieutenant Olson concluded that Mr. Jiminez was intoxicated and, from his general demeanor and the absence of the smell of alcohol, that he was on methamphetamine.

The officers testified that it is illegal to be intoxicated in public under both Utah law and Ute tribal law. From the totality of the circumstances, taking into account the officers' experience and judgment, it is clear that the officers were justified in conducting an investigatory detention of Mr. Jiminez.

The next question is whether the officers were legally jusitifed to conduct a pat-down search of Mr. Jiminez. "In order to comport with the Fourth Amendment, that search must have been 'reasonably related in scope' to the basis for the stop." United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000) (citing Terry, 392 U.S. at 20). During an investigatory detention officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo. Shareef, 100 F.3d at 1502. "In Terry the Supreme Court recognized that an officer could make a limited protective search for concealed weapons when the officer is justified in believing that the individual whose suspicious behavior he is investigating might be armed and dangerous to the officer." United States v. McLemore, 573 F.2d 1154, 1156 (10th Cir. 1978). The Tenth Circuit has concluded that an officer may conduct a

pat-down search if he "harbors an articulable and reasonable suspicion that the person is armed and dangerous." United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996); see also Hishaw, 235 F.3d at 570.

In the present case, the officers had properly detained Mr. Jiminez because he appeared to be under the influence of drugs.  When Lieutenant Olson asked Mr. Jiminez whether he had any weapons, Mr. Jiminez answered: "I don't know."  In view of the officer's reasonable belief that Mr. Jiminez was under the influence of drugs, Mr. Jiminez's response concerning weapons gave the officers cause for alarm and justified a pat-down search to see whether he was armed.

Before the officers began to pat down Mr. Jiminez, Lieutenant Olson removed the cigarette package from Mr. Jiminez's shirt pocket and found the methamphetamine inside.  The court, however, need not reach the question of whether this initial removal of the cigarette package and the examination of its contents violated Mr. Jiminez's rights.  Under the doctrine of inevitable discovery, the government may successfully defend against a motion to suppress if "the evidence in question would inevitably have been discovered without reference to the police error or misconduct." United States v. Eylicion-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995) (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)).  "Even if the initial search . . . was unlawful, 'the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means.'" United States v. White, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000)).

Here, the court has already determined that the officers were justified in conducting a pat-down search for weapons.  After discovery of the methamphetamine in Mr. Jiminez's shirt pocket, the officers continued the pat-down search for weapons.  The officers would have performed a full pat-down search of Mr. Jiminez regardless of their initial discovery of

methamphetamine. The pat-down search and the exploration of an obvious bulge in Mr. Jiminez's shirt sleeve revealed additional stashes of methamphetamine. This discovery would have led to further detention and the eventual and inevitable discovery of methamphetamine hidden in the cigarette package.

## ORDER

Accordingly, Mr. Jiminez's motion to suppress is DENIED.

DATED this 6th day of July, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge